**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

**vs.**                                    **Cr. No.  12-2679 JCH**

**KELVIN HILL,**

        **Defendant.**

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Kelvin Hill's *Motion to Suppress Evidence* [Doc. 41], filed December 9, 2013.  On January 14, 2014, the Court held an evidentiary hearing on the motion, for which Hill was present and represented by counsel. After considering the motion, the Government's response, the evidence presented at the hearing, and the relevant legal authorities and precedents, the Court concludes that the motion to suppress should be denied.

## FINDINGS OF FACT

On September 24, 2012, Hill was traveling on an Amtrak train from Los Angeles, California to Ohio. Los Angeles is known to agents of the Drug Enforcement Agency ("DEA") as a source city for drugs being sent to the American mid-west and the east coast. Transcript of Jan. 14, 2014 hearing (hereafter, "Tr.") at 28, 56. As a result, DEA agents regularly investigate the trains heading east from Los Angeles. *Id*. at 28-29.

On the day in question, the east-bound train on which Hill was riding made its regularly scheduled stop in Albuquerque, New Mexico. *Id*. at 10-11. After the Albuquerque passengers left

the train, DEA Agent Kevin Small boarded the last coach car. *Id*. at 11, 14. He was wearing a short-sleeved shirt, jeans, and tennis shoes. *Id*. at 44. Small also wore his DEA badge around his neck where it would be visible to passengers. *Id*. at 18, 30, 45. However, his gun and handcuffs were at his waist, concealed by his shirt. *Id*. at 44. Small went to the common luggage area on the lower level where passengers typically store larger items of luggage.[1] *Id*. at 11-13. After examining the bags in this area, Small noticed a black and white "Coogi" brand suitcase on the top shelf. *Id*. at 14-15, 61. The suitcase, which was about three feet tall, appeared new and was secured with a key lock, but it had no name tag. It was the only bag that was not labeled with the owner's name. *Id*. Often, people who transport narcotics do not fill out name tags for the bags containing controlled substances. *Id*. at 64. In moving the bag to look for the tag, Small determined that it was heavy. *Id*. at 67-68.

Small then walked up the stairs to the main seating area of the coach car. Starting at the rear of the car, he began speaking to the passengers one-by-one, identifying himself as a police officer and asking them basic questions about their identity, destination, and purpose of travel. *Id*. at 17-18. Small asked for and obtained consent to search some passengers' bags. Gov't Ex. 1. Small spoke to one male passenger who had gotten on the train in Los Angeles and was bound for Chicago, and who had no checked baggage.  After questioning him about his travel plans and looking at his identification, Small asked the passenger if he had any luggage with him.  *Id*. When the passenger said that he had only one orange bag with him on the train, Small asked for and obtained the passenger's consent to search it. *Id*. That search revealed no contraband. Small had similar encounters with passengers heading to New York. *Id*.

---

[1] According to Small, this common luggage area is to be distinguished from the storage area for checked bags, which is a separate car near the front of the train. Tr. at 83.

Eventually Small encountered Hill, who was seated in a window-seat on the right side, near the front of the coach car. Tr. at 19-20. After showing Hill his DEA badge, Small greeted him. Small said that he was with the police department and asked for consent to speak with Hill. Ex. 1. Hill consented, and Small asked him where he was heading. Hill replied that he was going to Youngstown, Ohio. Ex. 1. Small asked Hill where he got on the train, and Hill said, "L.A." *Id*. Small then asked Hill if he lived in Youngstown or L.A., and Hill said "Youngstown." *Id*. Small asked Hill how long he was in L.A., to which Hill responded, "Four days." *Id*. Small then asked Hill if he had his ticket with him. In response, Hill said yes and handed Small his Amtrak travel document, which bore the name Dewayne Zachary and was issued on September 23, 2012, the same day the train had left Los Angeles. *Id*.; Tr. at 20. The travel document stated that the passenger was traveling to Cleveland, Ohio. Tr. at 20, 23. After handing the document back to Hill, Small said, "Do you have your ID with you at all, Dewayne? Is your name Dewayne? Last name Dewayne or first name?" Ex. 1. Hill replied that Dewayne was the name of his cousin who obtained the ticket for him, and that his name was Kelvin. *Id*. Small then asked Hill if he had his ID with him. *Id*. Hill responded by handing Small his identification card (not driver's license), which was issued by the state of Ohio to Kelvin Tywan Hill about one month prior to the date in question. Tr. at 24, 71-72. After reviewing the card, Small returned it to Hill. Tr. at 24.

Next, Small informed Hill that he was talking to everyone onboard the train because there is a problem with people smuggling weapons, drugs, and other contraband. Small then asked, "Do you have any luggage with you at all?" Ex. 1. Hill pointed to the luggage rack directly above his head and said, "The Jordan bag." Ex. 1; Tr. at 22. Small looked in the overhead luggage rack, where he saw a relatively small black nylon bag with a red profile of a jumping basketball player. Ex. 7; Tr. at 24. Small picked up the bag and held it where Hill could see it and

3

asked, "The little bag here?"  Ex. 1; Tr. at 22, 72-74. Hill responded, "Yes, sir." Ex. 1. Small could feel that the bag was light. Tr. at 22, 74. Small asked Hill if that was all of his luggage, which Hill confirmed. *Id*. Small said, "You don't have a whole lot of luggage. You don't have anything strapped to you, do you?" *Id*.; Tr. at 22-23. Hill said no, at which point Hill asked Small for Hill's consent to a pat-down. Ex. 1. Hill consented and Small performed the pat-down, but he discovered no drugs or contraband. *Id*.; Tr. at 23, 75. Small thanked Hill and resumed talking to the remaining passengers on the coach car. Ex. 1; Tr. at 23, 29.

When he had finished talking to each of the passengers on the coach car, Small returned to the common luggage area on the lower level. Tr. at 29. Small removed the untagged black and white Coogi suitcase and carried it to the upper level of the train. *Id*. at 29-30, 76. Small rolled the suitcase down the center aisle, showing it to each passenger and asking if the bag belonged to them. Ex. 1; Tr. at 30. At that time each passenger, including Hill, denied ownership of the bag.[2] Ex. 1; Tr. at 30-31, 34. After no passenger claimed the Coogi suitcase, Small deemed it to be abandoned. He took it back to the lower level of the coach car, where he opened and searched it. Tr. at 35. Inside he found men's clothing, including pants with a size 40 waist; mens' t-shirts in sizes 2XL and 3X; two pairs of men's athletic shoes (Nike and Adidas), both size 10 ½; and five boxes of Dial soap, four of which were in unopened boxes.[3] Tr. at 35-36. Wrapped in some of the t-shirts were approximately 3.25 kilograms of cocaine. Tr. at 35.

Next, Small returned to the upper level of the coach car. Tr. at 39-40. He approached one of the passengers whose carry-on bag he had searched earlier. Tr. at 40. Small asked for and received permission to search the passengers' shoes. Tr. at 40. The passenger took off one of his

---

[2] However, at the January 14, 2014 hearing, Hill testified that the bag did in fact belong to him. Tr. at 93.

[3] During a more thorough search later in the day, Small located a sixth bar of Dial soap in the Coogi suitcase. Tr. at 37.

shoes and handed it to Small, who saw that it was size 9 ½. Tr. at 40. Small thanked the passenger and then moved on to Hill. Tr. at 40. Small asked Hill for permission to search Hill's black Jordan backpack, which Hill granted. *Id.*; Ex. 2. In the bag Small found an empty box of Dial bar soap, with the bar of soap itself lying elsewhere in the bag; a pair of flip flops, and some toiletry items. *Id.* at 41. Small closed the bag and placed it back on the overhead luggage rack. Tr. at 42-43; Ex. 2. Then Small asked Hill, "Can you take off one of your shoes for me? You don't have anything in your shoes, do you?" Tr. at 43; Ex. 2. In response, Hill removed one of his shoes and handed it to Small, who observed that it was an Adidas, size 10 ½. Tr. at 43. Small thanked Hill and walked away to speak to the conductors on the train. *Id.*; Ex. 2. Small informed them that he needed to arrest a passenger and, as the suspect was a large man, asked if they could assist him. They agreed and accompanied Small to the upper level, where Small placed Hill under arrest. Small then transported Hill and his bags to the Albuquerque District Office of the DEA. Tr. at 45.

## DISCUSSION

The Fourth Amendment protects against "unreasonable searches and seizures." "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).

Tangible property is seized when a police officer exercises control over the property by removing it from an individual's possession, *United States v. Place*, 462 U.S. 696, 707–708, 103 S.Ct. 2637, 2645 (1983), or when an officer informs an individual that he is going to take his property. *Id.* at 707 (Fourth Amendment seizure occurred when agents told Defendant, following

his refusal to consent to a search, that they were going to take his luggage to a federal judge to secure a warrant). On the other hand, no seizure occurs when an officer merely picks up an individual's property to look at it, because this interference with the individual's possessory interest is not meaningful. *See Arizona v. Hicks*, 480 U.S. 321, 324 (1987); *New York v. Class*, 475 U.S. 106, 114 (1986).

## I.  THE INITIAL ENCOUNTER AND THE ALLEGED SEIZURE OF THE SMALL, BLACK BAG

Hill contends that during the consensual encounter, Small illegally seized Hill's small, black bag when he briefly picked it up from the overhead luggage rack, and that he lacked reasonable suspicion to do so. When Small asked Hill if he had any luggage with him, Hill pointed at the luggage rack above his head and said, "The Jordan bag." In order to determine which bag Hill was referring to, Small picked up the black nylon bag, showed it to Hill, and asked, "This one?" In doing so, Small could feel that the bag was very light. Small then returned the bag to the overhead rack. Because Hill had said he was on a four-day trip, Small asked him if he had any other luggage, and Hill said that he did not. Small observed, "That is not a whole lot of luggage." Small then asked Hill if he would grant Small permission to perform a pat down of his person, which Hill granted. Hill argues that Small's conduct was not objectively reasonable because when he lifted Hill's bag, he had a law enforcement objective: to investigate passengers on the train for possible transportation of narcotics and weapons.

Federal appellate courts have addressed the contours of a passenger's right to privacy in a bag placed in an overhead luggage rack. For example, in *Bond v. United States*, 529 U.S. 334 (2000), Border Patrol Agent Cantu boarded a bus in Texas to check the immigration status of its passengers. *Id.* at 335. As he walked off the bus, he squeezed the soft luggage that passengers

had placed in the overhead storage space. *Id*. He squeezed a canvas bag above Bond's seat and noticed that it contained a "brick-like" object. *Id*. at 336. After Bond admitted owning the bag and consented to its search, Agent Cantu discovered a "brick" of methamphetamine inside. *Id*. Bond moved to suppress the drugs, arguing that Agent Cantu conducted an illegal search of his bag. The Supreme Court held that Agent Cantu's physical manipulation of Bond's carry-on bag violated the Fourth Amendment's proscription against unreasonable searches. *Id*. at 338-39. The Supreme Court's reasoning was based on two conclusions. First, a traveler's personal luggage is clearly an "effect" protected by the Amendment, and Bond both possessed and exhibited an expectation of privacy in his bag. *Id*. at 338. Second, Bond's expectation of privacy was reasonable. Here, the Court distinguished cases involving only visual, as opposed to tactile, observation, which is "simply more intrusive than purely visual inspection." *Id*. at 337. The Court concluded that while a passenger on a public conveyance might expect other passengers or employees to casually move his bag for one reason or another, he would not expect them to "feel the bag in an exploratory manner." *Id*. at 339.

In this case, Small did not squeeze the bag in order to obtain information about its contents. Rather, he lifted it to show it to Hill, and in the process he was able to determine its weight. In pre-*Bond* decisions, the Tenth Circuit has determined that merely lifting a bag in this manner does not infringe upon the owner's reasonable expectation of privacy. In *United States v. Gault*, 92 F.3d 990 (10th Cir. 1996), the Tenth Circuit found no unreasonable intrusion when Agent Small, looking for evidence of drug trafficking, noticed a zippered nylon gym bag on the floor in the seating area of an Amtrak train. The bag, which appeared to be new, protruded into the aisle approximately five inches. His interest piqued, Small kicked and lifted the bag to determine its weight. *Id*. at 991. The Tenth Circuit reasoned:

7

> Assuming that Gault had a subjective expectation that his bag would not be kicked or lifted as it was in this case, his expectation was not objectively reasonable. Gault left his bag unattended, with no one there to watch it or to protect it from being kicked or lifted. The bag was placed in front of an aisle seat so that a window seat passenger would have had to step over it, possibly kicking it in the process, or lifting the bag to avoid it. Perhaps more importantly, the bag protruded nearly half a foot into the aisle of the train car, making it more likely to be encountered by another passenger or railroad employee. . . . The information that Small obtained from the kick and lift of the bag, its weight and the solidity of its contents, was the same information that a passenger would have obtained by kicking the bag accidentally or by lifting it to clear the aisle.

*Id*. at 992. *In United States v. Hall*, 978 F.2d 616 (10th Cir. 1992), another pre-*Bond* decision, Small and another agent conducted a consensual encounter with the defendant, asking her about her travel plans. *Id*. at 618. Afterwards, Small lifted the defendant's bag (which had been previously identified by an Amtrak employee) to determine its weight, though he did not move the bag to another location at that time. *Id*. The Tenth Circuit held that Small's act of lifting the bag to feel its weight did not constitute a seizure because it only minimally interfered with defendant's possessory interest. *Id*. at 619.

Here, the Court concludes that although Hill enjoyed a full privacy expectation in the contents of his black Jordan bag, Small's actions in briefly lifting the bag only minimally intruded upon that interest and therefore did not constitute an improper search or seizure. Small lifted the bag only for a brief moment. This is consistent with what Hill might expect a fellow passenger to do. For example, another passenger might briefly lift Hill's bag to make room for his own bag. Small did not squeeze the bag to determine the size and shape of the contents, nor did he move the bag to another location outside of Hill's control. Accordingly, this case is more like *Hall* or *Gault*, and is distinguishable from the seizure that occurred in *Bond*.

Finally, Hill's argument that Small's investigative purpose in lifting the bag supports a conclusion that he violated the Fourth Amendment is unpersuasive. It has long been established that the subjective intent of the law enforcement officer is irrelevant in determining whether that officer's actions violate the Fourth Amendment. *See Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769 (1996) (stating that "we have been unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers"); *California v. Ciraolo*, 476 U.S. 207, 212, 106 S.Ct. 1809 (1986) (rejecting respondent's challenge to "the authority of government to observe his activity from any vantage point or place if the viewing is motivated by a law enforcement purpose, and not the result of a casual, accidental observation").

## II.   SEIZURE AND SEARCH OF THE COOGI SUITCASE

Next, the Court must determine at what point Small seized the Coogi suitcase.  After that, the Court must decide whether the events preceding that moment provided Small with reasonable suspicion or probable cause to seize it, s*ee United States v. Hall*, 978 F.2d 616, 619 and n. 1 (10th Cir. 1992) (stating that seizure of luggage occurs upon meaningful interference with possessory interest, and therefore all of the preceding events are relevant to the reasonable suspicion inquiry), or if it had been abandoned.

### A.    Removing the Suitcase From the Common Luggage Area

Hill argues that when Small removed the Coogi suitcase from the downstairs common luggage area and brought it upstairs to the main passenger seating area, he performed an illegal seizure. According to Hill, Small's actions constituted meaningful interference with Hill's possessory interest in the property, and Small had neither probable cause nor reasonable suspicion to believe that the suitcase contained contraband. In response, the Government

contends that Small did not effect a seizure of the Coogi suitcase until later, after each passenger, including Hill, disclaimed ownership and Small determined that the suitcase was abandoned.

After consideration, the Court concludes that Small did not seize the Coogie bag when he removed it from the common luggage area and took it to the upstairs seating area of the train car in order to ask passengers if the bag was theirs. The Court bases this conclusion in part on the reasoning in *Hall*. In that case, Agent Small received an informant's tip that defendant Penny Hall would be on a particular train when it arrived in Albuquerque and that she "might be transporting drugs," along with other details about her and her travel plans. *Id*. at 618. When Hall got off the train in Albuquerque and went to the station, an Amtrak employee identified her to Small, along with Hall's suitcase, which she had placed in the common luggage area of her train car. *Id*. Small and another law enforcement officer then confronted Hall, identified themselves, and asked her questions about her travel. They also asked Hall for consent to search her luggage, which she refused. *Id*. Hall reboarded the train, so Small went to the train's common luggage area and lifted her suitcase, finding it to be heavy. *Id*. Then, Small approached Hall and informed her that he was going to detain her suitcase in Albuquerque so that it could be smelled by a trained, drug-sniffing canine. *Id*. Small then explained to Hall that if the dog alerted to her suitcase he would search it, and if not, the suitcase would be shipped back to her. *Id*. The Tenth Circuit concluded that Small did not seize Hall's bag when he lifted it from its position in the common luggage area in order to feel its weight. *Id*. at 619-20. Instead, the court held that the seizure occurred when Small informed Hall that he was detaining her bag in order to have it sniffed by a narcotics canine. *Id*. at 620.

Similarly, in this case Small did not seize Hill's suitcase when he lifted it from its place in the common luggage area and took it upstairs to where the passengers were seated in order to

ask them who owned it. First, when the bag was in the common luggage area, it was not in Hill's immediate possession or control. In this way, the Coogi suitcase was unlike the carry on Jordan bag located in the overhead luggage rack. That bag, because of its physical proximity to Hill, was under his immediate possession and control. Thus, by bringing the Coogi suitcase upstairs, Small in no way interfered with Hill's possession or control of it. In fact, by bringing the suitcase upstairs where its owner could identify and exercise some measure of control over it, Small offered Hill the opportunity to exercise greater possession and control of the suitcase by identifying it as his own. Second, Small did not remove the suitcase from the train car. As a result, again Small in no way interfered with Hill's possession and control of his bag. Accordingly, the Court concludes that Small did not seize the bag merely by bringing it upstairs where Hill could exercise greater control over it. Rather, Small seized the suitcase when he took it back to the lower level of the coach car, opened it, and searched it.

Defendant relies upon the Eighth Circuit's decision in *United States v. Alvarez-Manzo*, 570 F.3d 1070 (8th Cir. 2009) in support of his argument that Small seized his bag when he brought it from the downstairs common luggage area to the upstairs passenger area. In *Alvarez-Manzo*, Nebraska drug interdiction officers met a Greyhound bus at an Omaha depot, where they observed passengers leave the bus while it was cleaned and refueled. *Id*. at 1071. The cargo area of the bus contained only five to seven bags. *Id*. One investigator's attention was drawn to "a newer black Swiss bag." *Id*. at 1072. The officer examined the luggage tag, which indicated that the bag was coming from St. Louis, Missouri, and was destined for Dayton, Ohio. This route was not consistent with a bag on a bus in Omaha, Nebraska. *Id*. Further, someone had handwritten "Indianapolis, IN" as the bag's destination over the printed destination, which was highly unusual. *Id*. Finally, the bag was padlocked. *Id*. Based on the foregoing, the officer removed the

bag from the cargo area of the bus. After the passengers reboarded the bus, the four investigators boarded the bus, which was half full. *Id.*   One informed the passengers that they were law enforcement officers, that no one was in trouble, but that they were trying to locate the owner of the black Swiss bag, which he held aloft. No one responded, so the officer read the information from the luggage tag, including the city of origin, destination, and printed name. Again, no one claimed the bag. The investigators then took the Swiss bag to the back of the bus and began asking the passengers, one by one, if the bag belonged to them. When they reached the defendant, who was in the middle section of the bus, he stated that the bag was his.

The issue before the Eighth Circuit was whether the officer's removal of the defendant's bag from the cargo area of the bus to the bus's passenger seating area to locate the bag's owner constituted a Fourth Amendment seizure. *Id.* at 1075. The determining fact in the court's decision was that the defendant in *Alvarez-Manzo* had checked the bag into the possession of the bus company. Relying on a prior Eighth Circuit decision, *United States v. Va Lerie*, 424 F.3d 694, 700 (8th Cir. 2005), the court in *Alvarez-Manzo* said that when a bag is entrusted to a third-party common carrier, law enforcement's detention of that bag constitutes a Fourth Amendment seizure only when the detention does any of the following: "(1) delay[s] a passenger's travel or significantly impact[s] the passenger's freedom of movement, (2) delay[s] [the checked luggage's] timely delivery, or (3) deprive[s] the carrier of its custody of the checked luggage." *Alvarez-Manzo*, 500 F.3d at 1075 (internal quotations omitted) (quoting *Va Lerie*, 424 F.3d at 707. In *Alvarez-Manzo*, the court determined that the third criteria was satisfied because the officers did not move the bag at the direction of any Greyhound employee. Thus, the officer deprived the carrier of its custody of Alvarez-Manzo's checked luggage, thereby seizing it in the process.

The case currently before this Court differs from *Alvarez-Manzo* and *Va Lerie* in one key respect: Hill did not check his bag, and therefore it was never in the possession of the common carrier, Amtrak. Hill did not entrust the Coogi bag to Amtrak. Instead, it remained in a common luggage area that was open to all passengers, and it remained Hill's responsibility to ensure that his bag traveled with him to his destination. Accordingly, Small did not deprive Amtrak of custody of the Coogi bag when he brought it to the upstairs passenger area, and the reasoning of the Eight Circuit in *Alvarez-Manzo* does not apply in this case.

**B.    Abandonment**

The next issue is whether by disclaiming ownership of the suitcase, Hill abandoned it and therefore forfeited his right to challenge the seizure and search of the bag. The Government argues that he did, and the Court agrees.

"The test for abandonment is whether the defendant has retained any reasonable expectation of privacy in the property." *United States v. Hernandez*, 7 F.3d 944, 947 (10th Cir. 1993). "Abandonment is akin to the issue of standing because a defendant lacks standing to complain of an illegal search or seizure of property which has been abandoned." *United States v. Garzon*, 119 F.3d 1446, 1449 (10th Cir. 1997). The inquiry is one of intent and subsumes both a subjective and objective component. *Id.; see also Hernandez*, 7 F.3d at 947. Further, a defendant's abandonment of property must be voluntary. *Hernandez*, 7 F.3d at 947. It is not voluntary if it results from a violation of the Fourth Amendment. *Id*. "However, police pursuit or investigation at the time of abandonment of property . . . does not of itself render abandonment involuntary." *Id*.

Hill argues that his abandonment of the Coogi bag was involuntary because it occurred subsequent to one or more Fourth Amendment violations—the "seizure" of the Jordan backpack

13

when Small briefly lifted it, and the "seizure" of the Coogi bag when Small brought it upstairs to the passenger seating area. However, the Court has concluded that neither of these actions constituted a seizure, and therefore up to the point of his abandonment there was no violation of Hill's Fourth Amendment rights that could render that abandonment involuntary. Other than these alleged prior violations of his constitutional rights, Hill offers no other basis for his contention that his abandonment was involuntary, and on the record before it the Court finds none. Hill had several opportunities to claim the Coogi bag, and he did not. Therefore, he abandoned it and can no longer claim that the search and seizure of the bag were improper.

## III.    CONSENT TO SEARCH THE BLACK JORDAN BACKPACK

Hill contends that Small's search of his black Jordan backpack was unconstitutional because, although he consented to the search, his consent was not voluntarily given. According to Hill, his consent was not valid because it followed Small's illegal seizure of the Jordan backpack and the Coogi suitcase, the taint of which had not dissipated. *See* Doc. 41 at 11. Again, Hill does not argue that Small coerced him through any other means, such as through threats, intimidation, coercion, or display of a weapon. Hill does not contend that any other factor such his youth, education level, lack of understanding of the English language, or mental disability contributed to the lack of voluntary consent. Rather, Hill's argument rests solely on the contention that Small had improperly seized the Jordan backpack and the Coogi bag before he consented, thereby rendering that consent involuntary. However, the Court has already concluded that Small did not improperly seize the black Jordan backpack when he lifted it from the overhead luggage rack. In addition, the Court has found that Small did not seize the Coogi suitcase when he brought it to the upstairs passenger area, and that the bag was not seized until after Hill abandoned it. Thus, these do not support Hill's contention that his consent was

involuntary. Because the record before the Court contains no other evidence to support a conclusion that Hill did not voluntarily consent to the search of the Jordan backpack, the Court will deny this portion of Hill's motion to suppress.

## IV.    THE WARRANTLESS ARREST OF HILL

Hill contends that his arrest was unconstitutional because the agents lacked both a warrant and probable cause to believe that he committed a crime. The Government, on the other hand, argues that the agents had sufficient evidence to support a finding of probable cause to believe that Hill had committed a drug trafficking crime.

This Court must analyze the constitutionality of a warrantless arrest under the probable cause standard. A police officer may arrest a person without a warrant if he has probable cause to believe that person committed a crime. *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995). "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense. *Id*. (citations and quotation omitted). In order to establish probable cause for a warrantless arrest, officers must "reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all." *Id*. at 1476–77.

The evidence in the record shows that at the time the agents arrest Hill, they knew that Hill was traveling from Los Angeles, a source city for narcotics, to the American mid-west. Hill was using travel documents issued on the day of departure in the name of another person, both of which are not uncommon for drug couriers. Hill told Small that he was on a four-day trip, yet he claimed that the small, lightweight Jordan backpack was his only luggage. That Jordan backpack contained an empty box of Dial bar soap, along with a bar of Dial soap and other toiletry items.

However, it contained no clothing, which is unusual for a multi-day trip. The empty box and the soap itself were identical to five boxes of Dial bar soap that were found in the Coogi suitcase, which also contained approximately 3.25 kilograms of cocaine. In addition, the Coogie suitcase contained men's clothing, including pants with a size 40 waist, numerous shirts in size 2XL, and two pairs of men's athletic shoes in size 10 ½. Hill was a large man whose size was not inconsistent with the clothes in the Coogi suitcase. Further, Hill was wearing size 10 ½ athletic shoes that were consistent with the shoes found in the Coogi suitcase. *See* Tr. at 49.

The foregoing evidence is sufficient to lead a prudent person to believe that the Coogi suitcase belonged to Hill, and therefore he was committing the crime of trafficking narcotics. Therefore, the agents had probable cause to arrest Hill.

In light of the foregoing,

**IT IS THEREFORE ORDERED** that Defendant Kelvin Hill's *Motion to Suppress Evidence* [Doc. 41] is **DENIED**.

_____
**UNITED STATES DISTRICT JUDGE**